Ronald David STURRUP

v.

UNITED STATES of America.

No. 2801-CR.

United States District Court
E. D. North Carolina,
Fayetteville Division.

May 30, 1963.

Stephen H. Nimocks (Court-assigned), Fayetteville, N. C., for petitioner.

Alton T. Cummings, Jr., Asst. U. S. Atty., Raleigh, N. C., for defendant.

BUTLER, Chief Judge.

This is a motion under 28 U.S.C.A. § 2255 to vacate a sentence of life imprisonment imposed by this Court on September 23, 1948, upon a plea of guilty of second degree murder.

The petitioner alleges as grounds for relief (1) that he was insane at the time of the commission of the offense, and (2) that he was insane or otherwise mentally incompetent at the time of trial and the entry of his plea of guilty. The petitioner alleges that he is now mentally competent.

An examination of the files and records of the case discloses the following facts:

The petitioner was indicted for first degree murder at the 1948 Fall Term of this court. Several weeks prior to arraignment the trial Judge appointed counsel for the petitioner and directed a psychiatric examination [1] by Dr. John W. Turner, at that time the Chief of Neuropsychiatric Service at the Veterans Administration Hospital in Fayetteville, North Carolina. The examination was given to determine petitioner's mental condition and, specifically, whether he knew right from wrong.

After a recital of the facts and circumstances on which his opinion was based, the examiner concluded:

"From the clinical point of view there was only a minimum of evidence suggestion that * * * [petitioner] was abnormal or psychiatric * * *. In short, it is the opinion of this examiner that this World War II colored veteran is potentially dangerous, that his Rorschach confirms his actual behaviour, that he killed his first sergeant in a rage which was not premeditated. However, with feelings of rejection, not getting a square deal and an inability during such periods of stress to keep in full touch with reality, his behaviour became unpredictable and dangerous. * * * [T]hat while his schizophrenic condition is not fully developed as he has some insight, that it will tend to progress and get worse. It is obvious that he will need institutional care for life for the protection of society, but his mental status suggests mitigating circumstances and that in reality the act was not really premeditated. Diagnosis: Schizophrenic reaction, incipient."

Thereafter, on September 20, 1948, petitioner was arraigned and entered a plea of not guilty to the charge. On September 23, upon the advice of counsel and with the consent of the government, a plea of guilty to second degree murder was tendered and accepted.[2] After the

---

1. At the hearing on this motion one of the Court-appointed trial counsel for petitioner testified that the psychiatric examination was made at the direction of the Court upon suggestion by petitioner's counsel after learning of petitioner's history of mental illness and in the hope of developing a defense to the first degree murder charge.

2. (Transcript, pp. 4–5)
    "Mr. Nance: (Defendant's counsel) The defendant at this time tenders to the Court and to the Government his plea of second degree murder.
    "Mr. Hubbard: (U. S. Attorney) We recommend acceptance of that.

"The Court: I inquire whether or not you have fully explained to the defendant the punishment or possible punishment provided by law for second degree murder in this court?
    "Mr. Nance: We have and I think he will so state that he could get life imprisonment and could not get in excess of that on this plea and he suggested to us if we could get such a plea we tender it to the Court.
    "The Court: Let the plea be entered. Ronald David Sturrup, you have heard the plea tendered by your counsel, plea of guilty of murder in the second degree, heard your counsel state that you

presentation of evidence, including the report of Dr. Turner, sentence was imposed.

Upon consideration of the motion and the files and records in the case, it was determined that they do not conclusively show, within the purview of 28 U.S.C.A. § 2255, that the petitioner is entitled to no relief. Although the issue of insanity at the time of the commission of the offense may not be raised by a motion under Section 2255, Bishop v. United States, D.C.App.1955, 96 U.S.App.D.C. 117, 223 F.2d 582, reversed on other grounds 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1955); United States v. Lawrenson, D.C.Md., 1962, 210 F.Supp. 422, aff'd., 4th Cir., 315 F.2d 612; Owsley v. Cunningham, D.C.Va., 1961, 190 F.Supp. 608, the mental competency of the accused to enter an intelligent plea of guilty is available as a ground for collateral attack under that section. United States v. McNicholas, 4th Cir., 1962, 298 F.2d 914; Pledger v. United States, 4th Cir., 1959, 272 F.2d 69.

"A man whose mind is so crippled by psychosis that he cannot understand the proceedings or confer intelligently about the case is in no position to plead guilty or to consent to such a plea in his behalf. If the trial court accepted a plea of guilty from such a man, the resulting judgment is vulnerable to collateral attack." Thomas v. Cunningham, 4th Cir., 1963, 313 F.2d 934, 938.

The length of time which has elapsed between the imposition of sentence and the raising of the issue of competency does not affect the claim. Section 2255 specifically provides: "A motion for such relief may be made at any time." Bishop v. United States, supra; Bostic v. United States, D.C.Cir., 1961, 112 U.S.App.D.C. 17, 298 F.2d 678.

There are instances where the issue of mental competency may be foreclosed by a proper determination at the time of trial, i. e., where the question of sanity is raised and determined before plea pursuant to 18 U.S.C.A. § 4244, Dodd v. United States, 10th Cir., 1955, 222 F.2d 175, or by a finding of competency by the trial Judge, Stone v. United States, D.C. Calif., 1960, 196 F.Supp. 386. But it does not appear that such a determination was made in this case. Cf: Taylor v. United States, 8th Cir., 1960, 282 F.2d 16; Smith v. United States, 9th Cir., 1959, 267 F.2d 210.

The allegations of the motion raise a question of material fact as to petitioner's competency to stand trial which is not conclusively resolved by the files and records, and justify a hearing.[3] Meadows v. United States, 5th Cir., 1960, 282 F.2d 942; Reed v. United States, 4th Cir., 1961, 291 F.2d 856.

have been advised that under the law the Court may, if he sees fit to do so, impose upon you a sentence for the term of your natural life. I ask you if that is your plea?

"The Defendant: Yes, sir.

"The Court: You consent or approve the plea of guilty of second degree murder which has been made by your counsel?

"The Defendant: Yes, sir."

3. The presentence report contained in the files of the case reveals the following history of mental health: "Defendant in public school testing in March 1938 scored I.Q. 107 and was considered of normal intelligence. Dr. Blau, psychiatrist for the Bureau of Child Guidance of New York City Board of Education, on May 20, 1942 examined the defendant and reported him to be a normal adolescent who was not psychotic. No evidence of incipient schizophrenia was noted, nor any outstanding neurotic symptoms. Dr. Blau noted defendant's deep feeling of rejection by his mother and considered he had indulged in depression about his life experiences.

"Mental examination in 1943, as a wayward minor committed to the New York State Vocational Institute, West Coxsackie, New York, disclosed he was quick tempered, impetuous, and inclined to fight. He was considered sane and competent.

"Mental examination in 1944 under the jurisdiction of Local Selective Service Board 133, Brooklyn resulted in the defendant being classified a 'constitutional psychopath, inadequate'. On this basis, he was granted a six month deferment from the draft."

■ Prior to the hearing, the Court assigned Mr. Stephen H. Nimocks, an experienced attorney, as counsel for the petitioner in this proceeding,[4] and counsel was afforded adequate opportunity to examine the files and records in the case and to confer with petitioner prior to the date of the hearing.

In addition, the Court requested the Director of the Federal Bureau of Prisons to proceed with a psychiatric examination of the petitioner under 18 U.S. C.A. § 4241 et seq., directed specifically to the issue of mental competency at the time of trial. The examination was performed by Dr. Francis J. Broucek, Chief of Psychiatry, Federal Penitentiary, Atlanta, Georgia. Dr. Broucek states:

"* * * [Petitioner's]. current level of intellectual functioning was estimated to be in the bright normal to superior range. His general vocabulary and verbal skills were well developed and his thought processes were well organized. Memory functions were unimpaired. The subject revealed himself to be a somewhat introverted individual who is preoccupied with primarily intellectual matters * * *.

"At the present time he does not appear to be suffering from any significant degree of mental illness. As far as his competency at the time of his trial is concerned, it is impossible to reconstruct his state of mind at that time with any degree of certainty. This examiner, therefore, feels that an opinion as to his competency fourteen years ago would be too speculative to be of any value to the Court. The psychiatric examination dated September 17, 1948, would provide a much better basis for deciding such an issue."

This finding is substantially in accord with that of Dr. J. A. McKay, Chief of Neuropsychiatric Service, Veterans Administration Hospital, Fayetteville, North Carolina, who, at the joint request of counsel for the petitioner and the government, also examined the petitioner prior to the hearing. His report concludes as follows:

"Just from seeing him now I am quite unable to say whether or not he was psychotic at the time of trial. This would be something like trying to predict the weather 15 years ago from what it is today."

At the hearing the Psychiatric Reports of Dr. Broucek and Dr. McKay, and the records of the trial, including the Psychiatric Report of Dr. Turner, were introduced into evidence.

The petitioner testified concerning his history of mental illness; his recollections of the trial,[5] and psychiatric treat-

---

4. Petitioner was represented by Mr. James R. Nance and Mr. Robert H. Dye (now deceased), Court-appointed counsel, throughout the proceedings in 1948. Petitioner requested the reappointment of Mr. Nance as his counsel in the present proceeding. The Court, being of the opinion that the testimony of former counsel would be competent and relevant upon the issue before the Court, United States v. McNicholas, 4th Cir., 1962, 298 F.2d 914; United States v. Pledger, 4th Cir., 1962, 301 F.2d 906; United States v. Bostic, D.C.D.C., 1962, 206 F.Supp. 855; United States v. Wiggins, D.C.D.C., 1960, 184 F.Supp. 673, appointed Mr. Nimocks in order that Mr. Nance might be available as a witness, if desired.

5. The following excerpts from the testimony of the petitioner at the hearing are pertinent:
(Direct examination by Mr. Nimocks:)

"Q. Do you recall the events of your trial? A. Well, no, I don't think I could really give absolute specifics. Of course, I know about people, things of that nature, but just exactly what was said and what not—Although I have referred to the trial. In fact, I have had it [transcript] in my possession for over a year at the penitentiary. Probably I could quote from there. But honestly speaking, to say specifically what was said, no.

* * * * *

"Q. Did you realize at all times during your trial that you were being tried for murder? A. Well, yes, more or less. Well, I realized that I had done something drastically wrong; in fact, that was impressed upon me in many instances. More or less speaking of the events after the trial, more or less the happy feeling that 'Now I will live,' more or less, and

ment and group therapy after his admission to prison.

Mr. George Z. Stuhl, an attorney who conferred with the petitioner in September 1948, while petitioner was in jail awaiting trial, testified that he visited the petitioner once or twice at the request of a member of petitioner's Army unit; that petitioner was rational in his discussion and supplied him with the address of his sister to whom Mr. Stuhl wrote in the hope of receiving assistance; that from his observations it was his opinion at the time that petitioner "had a persecution complex that someone had been after him over a period of years; that the man was not overly bright."

The government offered the testimony of Mr. James R. Nance, one of petitioner's trial counsel, and that of Mr. Robert M. Stevenson, the F.B.I. Agent in charge of the investigation of the case.

Mr. Nance testified that as one of petitioner's Court-appointed counsel he conferred with petitioner on several occasions in preparation for the trial; that his relation of the facts of the offense were always consistent; that the petitioner knew and understood the penalties for murder and the effect of a plea of guilty of second degree murder; that in his opinion, he had sufficient mental capacity to consult with his attorneys at the time of trial with a reasonable degree of rational understanding and that

he had a rational as well as a factual understanding of the proceedings against him.

Mr. Stevenson testified that he investigated the case and attended the arraignment and trial; that during his interview petitioner responded to all questions with rational and intelligent answers; that he did not recall anything unusual or abnormal in his behaviour, and that he had no opinion as to petitioner's mental condition at the time of trial.

The government also offered the Classification Study and the annual Progress Reports of the Bureau of Prisons, containing psychiatric evaluations of the petitioner during his confinement in the United States Penitentiary at Atlanta, Georgia. The initial psychiatric report, dated November 18, 1948, less than sixty days after petitioner's conviction and sentence, contains the following conclusion:

"At this time, he [petitioner] carries on a good conversation and his sensorium is obviously intact. He expresses a thoroughly favorable attitude toward this institution. It is felt that his crime was more of an expression of emotional immaturity than that of any definite criminal tendency. Diagnosis: Simple adult maladjustment."

The psychological report of the same date showed the petitioner was of average in-

---

'I am living—I must have done what I was supposed to have done,' and things of that type. It is very difficult for me to recall conversation of this nature fifteen years back. It was an impression of a happy feeling that I wasn't going to be executed.

\* \* \* \* \*

"Q. Do you think you were in touch with reality at the time of trial? A. In touch with reality? Could you make that a little more specific?

"Q. Were you actually aware of the nature of your crime? A. Well, I would have to say the nature of the crime and things of this type weren't on my mind at the time. The thing on my mind at the time was 'Will I be executed or not? Will I be killed?' My life was at stake. Quite naturally this was the most important thing in my mind at the time.

I don't know whether to say I didn't think or couldn't think or anything. The nature of the crime, no, I just didn't particularly think too much about it at that time.

"Q. Do you feel that you were fully aware of the nature of the plea that you entered, that is, one of second degree murder? A. I was aware that I could plead guilty to this. I was told to accept the fact I could plead guilty to this and live. I don't know. I want to be of help to you if I can. What I am trying to point out I was in a very turbulent period at that time; I don't know if I could even describe it now; I just wanted to live. I would have pleaded guilty to anything, I guess, when they said: 'If you do, you are going to live; if you don't, you are going to be executed.'

telligence, with an intelligence quotient of 108.

In October of 1951, petitioner was observed for seven days in the prison's Neuropsychiatric Ward and his condition diagnosed as "acute situational maladjustment". Thereafter, he engaged in group therapy and, during the last five months of 1955, he received individual psychotherapy "due to long standing feelings of hostility".

The 1958 psychiatric report concludes: "There are strong indications that the therapy which he received here was of great benefit to him in overcoming a great deal of hostility which had handicapped him for many years."

The issue before the Court upon this motion is the mental competency of the petitioner to stand trial in September 1948—more than fourteen years ago. It is obvious that the lapse of time renders the ascertainment of the fact at issue one of extreme difficulty.

■ A petitioner seeking to set aside his conviction on the ground that he was mentally incompetent at the time of plea and sentencing has the burden of establishing his position by a preponderance of the evidence, and the burden is particularly difficult to sustain if a long time has elapsed since the trial of the case. Bishop v. United States, 96 U.S.App.D.C. 117, 223 F.2d 582, 586; United States v. Wiggins, D.C.D.C., 1960, 184 F.Supp. 673.

From the files, records, and exhibits, the reports of psychiatric examinations of the petitioner, and the testimony of the witnesses, the Court makes the following

## FINDINGS OF FACT:

■ 1. Ronald David Sturrup, at the time of his plea and sentencing in September 1948, had sufficient mental capacity to consult with his attorneys with a reasonable degree of rational understanding, and had a rational as well as a factual understanding of the proceedings against him, and understood the na-

ture and effect of his plea of guilty to second degree murder.

2. Ronald David Sturrup has not sustained the burden of establishing by a preponderance of the evidence that at the time of the proceedings in 1948, he was insane or otherwise so mentally incompetent as to be unable to understand the nature of the proceedings against him or properly to assist in his defense.

## CONCLUSIONS OF LAW

From the foregoing facts the Court concludes that Ronald David Sturrup was mentally competent to stand trial at the time of his plea and sentencing on September 23, 1948.

Motion to vacate sentence is denied.